**In re Shirley Ann SMITH et al., Debtor.**

**Bankruptcy No. 79–00208.**

United States Bankruptcy Court, District of Columbia.

June 16, 1980.

Ira C. Wolpert, Washington, D. C., for respondent John P. Devers.

## MEMORANDUM OPINION

ROGER M. WHELAN, Bankruptcy Judge.

(Show Cause Order to John Devers, Esq., attorney of record in above-captioned cases, issued pursuant to 11 U.S.C. § 329, Bankruptcy Rule 220)

On January 10, 1980, this court issued a show cause order to John Devers, Esq. (hereinafter, "the respondent"), as attorney of record in each of the above-captioned cases, pursuant to 11 U.S.C. § 329 and Bankruptcy Rule 220[1] as to:

"Why this court should not review and take action regarding the nature and value of the services rendered in the above-captioned cases and determine what is in fact a reasonable fee for the services actually rendered, and order the return of all or part of the fee received by him as attorney for the above-named debtors; and why this Court should not consider, in reviewing the nature and value of services rendered, the extent of the attorney's compliance with the standards of competence and ethical conduct as set forth in the Code of Professional Responsibility; . . . " See order to Show Cause dated January 10, 1980.

Because of the similarity of facts and legal issues involved in each of the above-captioned cases, the order to show cause also directed that the cases be consolidated for purposes of trial hearing. The order to show cause was issued as a result of a series of problems which came to this court's attention in the context of several of the above-captioned cases, namely:

(1) Numerous substantive and procedural errors committed by this attorney in the conduct of these cases which worked to the prejudice of several of the individual debtors;

(2) The attorney's active association with a debt consolidation agency known as

---

1. The pertinent statutory and procedural provisions applicable to the subject show cause hearing are as follows:

"§ 329 Debtor's transactions with attorneys.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the trustee, if the property transferred—

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under Chapter 11 or a 13 of this title; or

(2) the entity that made such payment." 11 U.S.C. § 329(b)

"Rule 220. Examination of Bankrupt's Transactions with his attorney.

(a) . . . On motion by any party in interest or on the court's own initiative, the court may examine any payment of money or any transfer of property by the bankrupt, made directly or indirectly and in contemplation of the filing of the petition by or against him, to an attorney for services rendered or to be rendered." Bankruptcy Rule 220(a).

American Financial Services, Inc.[2] (hereinafter, "AFS"), which agency referred all of the above-captioned debtors to this attorney;

(3) The apparent conflict of interest existing in each of the cases by reason of the fact that the attorney for each of the above individual debtors was also acting, at the same time, as counsel for the debt consolidation agency, AFS. A response was filed to the show cause order by Ira Wolpert, Esq., acting as attorney for the respondent, and certain jurisdictional objections were noted and disposed of at the hearing.[3]

The show cause hearing was conducted in open court on April 25, 1980, at which time the court heard testimony from several of the debtors, as well as the testimony of the attorney, John Devers.[4] Based on the testimony adduced at this show cause hearing, and based on the evidence of record, the court finds the following facts.

2. Debt consolidation agencies are expressly prohibited in the District of Columbia by reason of Title 22, § 3426 of the District of Columbia Code (1973 Ed. as amended) which, in relevant part, provides:

§ 3426(b): "Except as provided in subsection (c), no person, partnership, association, or corporation shall engage in the business of debt adjusting in the District of Columbia." Debt adjusting is specifically defined to include:

§ 3426(a)(1): " 'Debt adjusting' means an activity, whether referred to by the term 'budget counseling', 'budget service', 'credit advising', 'debt adjusting', 'debt counseling', 'debt help', 'financial adjusting', 'financial arranging', 'prorating', or some other term of like import, which involves a particular debtor's entering into an express or implied contract whereby the debtor agrees to pay an amount or amounts of money periodically or otherwise to a person who agrees, for a consideration, to distribute such money among specified creditors in accordance with the plan agreed upon between the debtor and the person to whom the debtor makes or agrees to make such payments."

3. These issues and arguments raised by counsel for the respondent are discussed and disposed of in the Conclusions of Law, *infra*. The cases transferred, which are not the subject of this court's consideration, are as follows:

In re: *Vivian M. and James A. Hauser, Jr.*;
In re: *Cecelia A. Leach*;
In re: *Brenda K. Carter*;

## FINDINGS OF FACT

The respondent is a member of the District of Columbia bar only and was admitted to practice in this jurisdiction in 1972. From 1972 through September 1979, he was an officer in the United States military and practiced law only on an occasional or part-time basis. Throughout this latter period of time, he maintained no law office in the District of Columbia and handled various legal matters such as domestic cases and general business cases. Prior to the filing of the thirty-three subject bankruptcy cases, as set forth in the above caption, the respondent had not engaged or practiced in the Bankruptcy Court.[5]

This pattern changed in October of 1979 [6], when the respondent became legal counsel for a corporation known as American Financial Services, Inc., a Delaware corporation, authorized to transact business in the District of Columbia.[7] In addition, the re-

In re: *Beatrice Rozier*;
In re: *Kevin G. Madden*

4. In view of the number of bankruptcy cases and Chapter 13 cases involved, the court took the testimony of four of the individual debtors designated at random, and that of the respondent, as attorney of record, in each of the above-captioned cases. The court also took judicial notice of the records in each of the above-captioned cases, and particularly the respective schedules and statements of affairs (or Chapter 13 statement in Chapter 13 cases). The court also relies upon the answers filed by the respondent, in response to this court's interrogatories of January 10, 1980.

5. In fact, other than purportedly reading articles concerning the passage of the new Bankruptcy Code, this respondent never even attended any type of seminar on the new Bankruptcy Code until late March, 1980, some two-and-one-half months after the issuance of the show cause order.

6. October 1, 1979, just happened to be the effective date of the new Bankruptcy Code. *See*: Title IV of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, § 402(a).

7. Other than the testimony of the respondent, there is no official evidence of the corporation's status in this jurisdiction. However, the testimony of the respondent indicates that it was incorporated originally as a for-profit corporation.

spondent was also an officer (vice-president) and director of this corporation and active in developing their structure, policy and business contracts. See Transcript, p. 122. As manifested by the testimony of the respondent and the debtors represented by him, the business conducted by AFS was that of a debt pooling or debt consolidation agency. See Transcript, p. 18–20, 49, 119–121, 160. Each of the debtors represented by the respondent testified that they were first attracted to AFS by reason of an advertisement run in local newspapers, including the Washington Post, that stated, *inter alia, "Get out of debt."* In almost all of the above-pending cases, the individual debtors who responded to this advertisement were low- to middle-income wage earners, with few assets and little education.

Based on the testimony of each of the debtors who appeared in response to this show cause order, the following pattern emerges after the initial reaction to the above advertisement: A visit was made, usually after a telephone appointment, to the offices of AFS at 815 15th Street, N.W., in the District of Columbia, and the debtor conferred initially with a lay individual identified as Michael Moser.[8] Mr. Moser conferred with each of the individual debtors and certain forms were filled in by the debtors relating to their employment, income and outstanding debts. If their debt and financial structure warranted it, pro-rated payment would be made to the creditors. If a case was chosen for pro-rating, the agency (AFS) would assess a charge of approximately $250.00 to $300.00 for its services[9] in working out a repayment schedule with creditors. As might be expected, each of the individual debtors who testified at the show cause hearing was referred to the respondent because their financial condition apparently warranted additional relief. Each of the debtors met and conferred with the respondent at his offices, which were located in the same physical office suite as AFS at 815 15th Street, N.W. In fact, although the respondent's office was marked "Attorney-at-Law", the phone number for this respondent was the same phone number as that used by AFS. In addition to maintaining his law office within the same suite as AFS, the respondent also testified that his secretary and furniture were supplied on a reimbursable basis by AFS. In addition, as counsel for AFS, the respondent was paid a weekly salary of $300.00 and was entitled to a 10% share of the profits of this corporate enterprise.[10] During the period of October through January 1980, approximately 70% of his time was devoted to the affairs of AFS[11], and the balance of the time was spent primarily in representing debtors in the United States Bankruptcy Court.

Based on this respondent's intimate and working relationship with AFS, it was inev-

---

**8.** The testimony of the respondent as to the nature and size of the corporation's operations (Transcript, p. 121), suggests to the court that AFS is a closed corporation and was incorporated by close or related family members. The testimony of John Devers, the respondent, as well as that of the debtors, further establishes that the employees of this corporation, other than the respondent, are not attorneys-at-law— in fact, John Devers was not even aware of the educational or occupational credentials of these individuals. (Transcript, p. 127)

**9.** It is interesting to note that despite his active involvement with AFS, as both counsel and as a director and officer, his testimony as to the assessment of fees was far from precise. See Transcript, p. 120 and 128–129.

**10.** Testimony of the respondent further establishes that the sole business affairs of AFS was the debt consolidation business described above. (See Transcript, p. 123–124.) In fact, it was apparently the sole reason for their incorporation.

**11.** It is ironic that in January 1980, the corporate status of AFS was changed to that of a not-for-profit corporation " . . . Because it was brought to their attention that a provision of the D.C.Code prohibited profit-making corporations from being engaged in the business in which they were engaged. It was unknown to them and to me at the time although diligent searches had been made of the D.C. Code for that purpose." (See Transcript, p. 125.) In February of 1980, this attorney further resigned as an officer and director, but still continued his employment status as their legal counsel. The court notes that charges were and are still being assessed for their "services".

itable that debtors referred to this respondent for legal representation would misinterpret or misunderstand the precise role of this attorney—namely, the client was unsure whether he was acting as an attorney in private practice as their attorney, or as counsel for AFS. This is amply demonstrated by reference to the testimony of Carlton M. Young, who, in response to the court's questioning concerning this matter, responded:

"A Mr. Mosure [sic] never actually said he was working in connection or in conjunction with Mr. Devers. In the immediate proximity of the office it would give you the impression that the legal services with—the legal services that Mr. Devers gave were in conjunction with American Financial Services.

"In other words, if there was any problem as far as the creditors, then Mr. Devers would be able to handle the legal aspects of it. This was my impression." (See Transcript, p. 78, lines 10–17.)

This confusion or "impression" inevitably resulted from this attorney's maintenance of his practice in close connection with the business affairs of AFS. In fact, a call to the attorney would, of necessity, be answered "American Financial Services" (See Transcript, p. 36).

As might be expected from the above findings, all of the debtors in the above-captioned cases, without exception, were referred to the respondent by AFS, his "corporate client." In each of these cases, the attorney had a standard retainer agreement which set forth the fee to be charged for services in connection with each pending case.[12] Based on the testimony of the debtors who testified at the show cause hearing, and as corroborated to a large extent by the respondent's own admissions (Respondent's Response to Questionnaire issued pursuant to 11 U.S.C. § 329 and Bankruptcy Rule 220, Item 19), the total time dedicated to each case by this attorney was 1½ to 2 hours. Of greater importance as to the quality of services rendered in these cases is the fact that the respondent reviewed the various materials furnished by his clients, but did not make any independent investigation or verification of such matters.[13] Moreover, a thorough review of the cases and the attorney's response to this court's interrogatories indicate that, for the most part, relatively routine type services were rendered (example, telephone calls to creditors, preparation of schedules and assets, etc.) and nowhere in the record (See Response to Questionnaire, Items 11 and 19) is there any indication that the attorney engaged in any legal research concerning the various legal issues in these cases.[14] In at least some of these cases, as illustrated by the testimony of Carlton M. Young and Annie Martin, preparation of the schedules and statement of affairs was, to some extent, prepared by either a secretary or by Mr. Moser. (See Transcript, p. 58–59.)

While certain routine matters can properly be handled by non-legal personnel such as secretaries or paralegals, the preparation of the statement of affairs involves detailed

---

**12.** The average fee assessed appears to be approximately $400.00 in each of the 33 pending cases, and the total fees assessed for these cases (October 1, 1979 through January 3, 1980) totalled $13,225.00.

**13.** In other words, no verification or check was apparently ever made of judgments that may have been pending or secured in local courts, or a search for such matters as filed financing statements that might indicate a security interest in favor of a particular creditor. (See Transcript, p. 139–40.)

**14.** This was clear to the court by reason of the numerous problems arising in many of the Chapter 13 cases filed by counsel. Many of these cases, as reflected by the docket records, could not be confirmed because of a failure to provide for a specific treatment of secured creditors pursuant to 11 U.S.C. § 1325. Moreover, in at least two of the Chapter 13 cases, when questioned by the court as to why no action was taken to assert certain rights of the debtor to void non-possessory, non-purchase money security interests (See: 11 U.S.C. § 522(f)), counsel was not aware or cognizant of the relevant sections of the code involved. Further evidence of the attorney's lack of familiarity with fundamental concepts of bankruptcy law deals with such matters as whether parking fines are exceptions to discharge in a bankruptcy case. (Transcript, p. 55.) See: 11 U.S.C. § 523(a)(7).

matters crucial to legal issues that may arise in bankruptcy proceedings—for example, transfers of property may be challenged by a trustee as fraudulent transfers, certain loan repayments may form the basis for a preference attack by the trustee, etc., and should therefore be completed by legal counsel. Moreover, insofar as Mr. Moser performed services in connection with any bankruptcy case, it must be emphasized that this individual was not an employee of the attorney, but was connected solely with AFS. There is further evidence that indicates that the respondent did not devote sufficient time to reviewing the statement of affairs and schedules filed based on the paucity of detail and numerous omissions which this court observed in several of the cases filed.[15]

Finally, at the time of the show cause hearing, the court reviewed in detail for the benefit of the respondent and his counsel, Mr. Wolpert, the numerous omissions, errors, and deficiencies in the cases filed with this court.[16] (See Transcript, p. 5–10; Footnote 14, *infra*.) In the main, these errors, omissions, and deficiencies consisted of:

(1) Numerous arithmetical miscalculations;

(2) Failure to properly identify creditor interests—example, purchase money security interests, etc.;

(3) Listing secured creditors without a full description of collateral, or, in at least one case, omitting a secured creditor entirely:

(4) Failure to apply in Chapter 13 cases for compensation as debtor's counsel and receiving fees in such cases without prior court approval;

(5) Failure to timely disclose monies paid in on many Chapter 13 cases which were maintained by respondent in this attorney's trust account;

(6) Failure to properly evaluate the time needed to consummate a Chapter 13 plan;

(7) Failure to distinguish between semi-monthly and bi-weekly payments in Chapter 13 cases;

(8) Failure to observe proper venue requirements;

(9) Failure to properly deal with secured creditors with respect to confirmation standards set out under Bankruptcy Code, Section 1325(a)(5).

Because the court's ultimate ruling will be predicated *primarily* on the ethical considerations raised by this attorney's conduct, rather than upon the technical shortcomings in the context of these cases, a more extensive outlining of the deficiencies existing in many of the above cited cases is deemed unnecessary.

## CONCLUSIONS OF LAW

■ By way of written response to this court's show cause order, and orally at the time of the court hearing, the attorney for respondent raised objection to this court's conducting a hearing on those cases that were either transferred or closed. In view of the fact that the court has not considered the merits of those cases which were previously transferred to other districts[17] because of venue considerations, no further discussion is warranted. As to those cases which were closed[18], the court specifically

---

**15.** The Court's inference is based not only on the court's personal observation at various court hearings, but also on the testimony of the debtors who appeared in response to the show cause order. (See Transcript, p. 63.)

**16.** It should be noted that other cases were filed by this attorney in both the adjacent jurisdictions of Maryland and Virginia, and the court is not inquiring into those cases which are the subject of transfer orders based on improper venue.

**17.** See Footnote 3, *supra*.

**18.** The following cases were *dismissed* by court order:

In re *Donald Robert Gossage*, dismissed effective January 24, 1980, on motion of debtor;

In re *Lewis Edward and Annie Mae Stokes*, dismissed on December 21, 1979, for failure of the plan to meet the liquidation test and good faith requirement set forth in 11 U.S.C. § 1325;

In re *Farrel Glenn Leqer*, dismissed on February 6, 1980, for failure to cooperate with trustee after confirmation.

noted prior to dismissing the cases in question that a formal inquiry would be conducted pursuant to Bankruptcy Rule 220 and Section 329 of the Bankruptcy Code and that the order to show cause was in fact pending at the time the case was closed. Furthermore, all of the cases were dismissed for substantive and/or procedural problems and were not closed after the usual administration of an estate by a trustee. Accordingly, the court's action in reviewing the matter of the fees is vital in protecting the interest of the debtor and is not resulting in prejudice to the attorney, as he was on notice of the action to be taken prior to the "closing" of the estate.

The final substantive objection raised by counsel for the respondent has to do with this court's ". . . reviewing the nature and value of services rendered and the extent of respondent's compliance with the standards of ethical conduct as set forth in the Code of Professional Responsibility." Respondent submits "(a) that the standards of ethical conduct with which Respondent must comply as an attorney are solely within the jurisdiction of District of Columbia Bar Counsel and not this Court, and in fact Bar Counsel is presently aware of certain aspects of Respondent's activities; (b) to require him to explain or defend himself before this Court and Bar Counsel is burdensome and unnecessarily expensive to Respondent, judicially inefficient and may result in conflicting determinations, and otherwise would prejudice Respondent in presentation of his position before Bar Counsel; and (c) in determining what is a reasonable attorney's fee this court should consider only those factors which bear upon the purpose, nature, extent and value of services rendered, time spent, difficulty of questions and problems encountered, and other such factors which relate to services actually rendered in each case exclusive of ethical considerations." (See Response to Order to Show Cause, filed March 13, 1980, ¶ 3.)

Essentially, respondent's attorney would have the court consider the reasonableness of fees assessed in each of these cases by exclusive resort to ". . . those factors which bear upon the purpose, nature, ex-tent and value of services rendered, time spent, difficulty of questions and problems encountered, and other such factors which relate to services actually rendered in each case exclusive of ethical considerations." (See Response to Show Cause Order, *supra*, ¶ 3.) While it is true that the court's consideration and award of attorney's fees is with specific reference to those factors set forth in Bankruptcy Rule 219(c)(1), it is impossible to separate ethical considerations from these same factors. The Code of Professional Responsibility is an attempt to define and promulgate minimum standards which attorneys must meet in rendering services to the public. As aptly set forth in the preliminary statement to the Code of Professional Responsibility:

" . . . however, they do define the type of ethical conduct that the public has a right to expect not only of lawyers but also of their non-professional employees and associates in all matters pertaining to professional employment. A lawyer should ultimately be responsible for the conduct of his employees and associates in the course of the professional representation of the client." Code of Professional Responsibility and Opinions of the D.C. Bar Legal Ethics Committee, p. 1M (1976).

Furthermore, this court has the responsibility to be sure that all attorneys who practice before it do so with full awareness of their responsibility to the public and to this court. The role of counsel in all court proceedings is not merely to turn out, in a perfunctory and mechanical fashion, pleadings which simply "pass muster," but to conscientiously and ably represent a client in the highest tradition of the law. To say that this court should simply defer consideration of these ethical questions involved in this proceeding, simply because the matter has been referred to and is pending before the D.C. Bar Counsel, would be to shirk from this court's sworn responsibility to uphold the law. The duty of every court in this area is appropriately set forth in the case of *In re Meeker*, 76 N.M. 354, 414 P.2d 862, 864 (1966), appeal dismissed,

385 U.S. 449, 87 S.Ct. 613, 17 L.Ed.2d 510 (1967) in this directive:

> "The Canons of Professional Ethics must be enforced by the courts and must be respected by members of the bar if we are to maintain public confidence in the integrity and impartiality of the administration of justice."

■ Relevant to this court's procedure employed in each of these cases is the fact that the area of defined responsibility is to determine the reasonableness of fees and to protect both the debtor and creditor interest in each case. Misconduct which may warrant disciplinary action is within the proper sphere of the Bar Counsel in this case,[19] but in determining the reasonableness of fees in respect to debtor cases, the court must inevitably be guided by ethical considerations. The authority of the Bar Counsel to examine the ethics of an attorney's conduct in order to effect disciplinary action does not subtract from the Bankruptcy Court, authority and responsibility to look at ethics in the examination of fee transactions. In *Hightower v. Detroit Edison Company*, 262 Mich. 1, 247 N.W. 97 (1933), the court considered the issue of ethics in determining whether an attorney should be permitted to recover a fee. The court held, as part of its definition of the court's role in this area:

> "To say that, although such misconduct may justify disbarment or contempt proceedings, the court must award compensation to an attorney for services tainted thereby, would put the court in a position of approving or ignoring gross breach of duty to client and court. Something may be said in favor of denial of fees on the ground that plaintiff could not be forced

to pay because appellant was not in fact her attorney. But we lay denial upon the broader ground that the judgment of the court will not be given in aid of or to encourage unprofessional conduct infringing the integrity of judicial proceedings." 247 N.W. at 101.

In these cases, based on all of the evidence of record, including the testimony of the witnesses taken at the show cause hearing, the court concludes, in connection with determining the reasonableness of fees, that the attorney's conduct was unethical and that the following disciplinary rules were violated:[20]

1) Disciplinary Rules under Canon 2:

DR 2–102 Professional Notices, Letterheads, Offices and Law Lists

(A) A lawyer or law firm shall not use or participate in the use of a professional card, professional announcement card, office sign, letterhead, telephone directory listing, law list, legal directory listings, or a similar professional notice or device if it includes a statement or claim that is false, fraudulent, misleading, or deceptive within the meaning of DR 2–101(B) or that violates the regulations in DR 2–101(C).

DR 2–103 Solicitation of Professional Employment

(A) A lawyer shall not seek, by in-person contact, his or her employment (or employment of a partner or associate) by a non-lawyer who has not sought his or her advice regarding employment of a lawyer, if:

(1) The solicitation involves use of a statement or claim that is false, fraud-

---

19. United States Bankruptcy Court, as a separate department of the United States District Court, has previously adopted its own Local Rules in October 1979, which in turn incorporate

> "All applicable provisions pertaining to the discipline of attorneys and enforcement thereof as set forth in District Court Local Rule 4–3 through 4–6 shall be fully applicable to this court." (Local Rule 3(a)(5).)

Accordingly, while these findings will be forwarded to the Bar Counsel, it is the court's opinion that the provisions of the United States

District Court Local Rules 4–3 through 4–6 should be followed in reference to formal disciplinary action.

20. The court's ruling on the matter of fees in these cases is based on the evidence adduced at the show cause hearing including, of course, those individual cases noted in the pleadings filed therein and is not intended to limit or discourage further investigation by the D.C. Bar Counsel in determining whether other violations may also have occurred.

ulent, misleading, or deceptive within the meaning of DR 2–101(B); or

(2) The solicitation involves the use of undue influence; or

(3) The potential client is apparently in a physical or mental condition which would make it unlikely that he or she could exercise reasonable, considered judgment as to the selection of a lawyer.

2) DR 3–101 Aiding Unauthorized Practice of Law

(A) A lawyer shall not aid a non-lawyer in the unauthorized practice of law.

3) DR 5–105 Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, [or if it would be likely to involve him in representing differing interests] except to the extent permitted under DR 5–105(C).

4) DR 6–101 Failing to Act Competently.

(A) A lawyer shall not:

(1) Handle a legal matter which he knows or should know that he is not competent to handle, with associating with him a lawyer who is competent to handle it.

(2) Handle a legal matter without preparation adequate in the circumstances.

5) DR 1–102 Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

. . . . .

(4) Engage in conduct that is prejudicial to the administration of justice.

The court will discuss each of the above violations seriatim based on the evidence of record.[21]

1) DR 2–102 Professional Notices, Letterheads, Offices and Law Lists

DR 2–103 Solicitation of Professional Employment

Both of the captioned disciplinary rules, which are mandatory in nature, fall within the general penumbra of Canon 2 which states that "A lawyer should assist the legal profession in fulfilling his duty to make legal counsel available," a general statement or norm which lawyers are expected to follow. The respondent has violated Rule DR 2–102 by reason of maintaining a deceptive appearance in respect to the operation of his law offices in conjunction with a for-profit corporation engaged in debt consolidation. There is no dispute that the attorney's office space was located within the same suite as AFS, that he used the same telephone number and the telephone calls to this lawyer were answered, "American Financial Services." Furthermore, the very nature of his services created in the minds of his clients an image inseparable from that of AFS. The impression that resulted is clear from the testimony of such debtors as Carlton Young who testified in part that:

"A Mr. Moser never actually said he was working in connection or in conjunction with Mr. Devers. In the immediate proximity of the office it would give you the impression that the legal services with—the legal services that Mr. Devers gave were in conjunction with American Financial Services.

In other words, if there was any problem as far as the creditors, then Mr. Devers would be able to handle the legal aspects of it. This was my impression." (Transcript, p. 78.)

DR 2–101(B) provides that:

"(B) Without limitation a false, fraudulent, misleading, or deceptive state-

**21.** Admittedly, there is no Federal statute which makes the Code of Professional Responsibility binding upon attorneys who practice in the Federal court system. Yet it is a traditional and established code of conduct for all attorneys and the court has inherent power to enforce its promulgated mandates. *See: Estates Theaters, Inc. v. Columbia Pictures Industries, Inc.*, 345 F.Supp. 93 (D.C.S.D.N.Y.1972)

ment or claim includes a statement or claim which:

(1) Contains a material misrepresentation of fact;

(2) Omits to state any material fact necessary to make the statement, in the light of all circumstances, not misleading;

(3) Is intended or is likely to create an unjustified expectation;

.    .    .    .    .

(6) Contains a representation or implication that is likely to cause an ordinary prudent person to misunderstand or be deceived or fails to contain reasonable warnings or disclaimers necessary to make a representation or implication not deceptive."

In the context of these cases, based on the evidence of record, it is clear to the court that individual debtors could not reasonably be sure of the specific identity and role of the attorney who was purporting to represent them—was the attorney representing them an attorney in private practice, or an attorney for AFS?

Of greater consequence is the attorney's role in respect to the solicitation of his professional employment by these individual debtors. While this case is certainly not typical of "ambulance chasing" in its classi-cal form, there is a clearly discernible pattern of in-person solicitation by this attorney which, in the opinion of this court, constitutes a clear violation of DR 2–103. The solicitation originally commences with the utilization of an advertisement employed in several local newspapers which creates the expectation of debt relief—specifically "Get out of debt." [22] Although the ad that first attracted these people was the advertisement of the debt consolidation agency, AFS, the respondent was active in the incorporation and management of this business and was fully aware of the ad and its contents. In fact, he specifically testified that he " .  .  . was helping them to develop their office structure, reviewing the policy that they proposed embarking upon, any contracts that they had engaged in with creditors, things of that sort—.  .  ." (Transcript, p. 122.) It is further obvious that the sole reason for the creation of AFS was to capitalize on the enactment of a new Bankruptcy Code which was to take effect on October 1, 1979. Although the attorney disclaims any active or "in-person" solicitation of clients, it is clear to .the court that AFS was created specifically as a referral mechanism, in addition to the maintenance of a debt consolidation business.[23] In fact, all of the indi-

---

**22.** The testimony of Carlton Young refers to the caption "Get out of debt" and certain other words as well that " .  .  . explained certain things that they could help you with" (Transcript, p. 72–73.) Moreover, the testimony of Mr. Rudolph Preston makes it clear as to the impression created in the minds of the individual debtor:

"Q Now, Mr. Preston, how did you first have contact with Mr. Devers, the attorney?
A I was looking in the newspaper and I seen his article, you know.
Q What specific article are you referring to, Sir?
A It is an advertisement in, I guess it is the employment section about the kind of help you can get to get out of debt, and I called the number in the paper." (Transcript, p. 96.)

The advertisement was, therefore, by its nature misleading. It is clear to the court, based on an overall impression of the debtor's testimony received or adduced in these cases, that the individual debtors considered AFS and Mr. Devers to be substantially the same entity.

**23.** In fact, the respondent testified that:
"I don't solicit these people, if that is—" (Transcript, p. 130)

Although these self-serving statements seemingly indicate no intention of actively soliciting clients on his own, the overwhelming evidence of record indicates that he actively participated in forming a corporation that would foreseeably result in numerous debtor referrals. The respondent testified that, after the initial interview by the AFS representative, if debt pooling was not feasible *consultation with a lawyer was suggested*, and "The client *invariably* would say, 'Well, I don't know any. Can you recommend one to me?'" (Transcript p. 129, emphasis added.) Moreover, in view of the size and kind of office operations involved, there is every reason to believe that the attorney rendered services to individual debtors in connection with the affairs of AFS itself. Although not possessing the mandatory character of a rule, ethical consideration EC 2–8 would seem to be clearly applicable, namely:

"Selection of a lawyer by a lay person should be made on an informed basis. Advice and

vidual debtor cases filed by this attorney during the time period in question were the result of AFS referrals.

Although there is no evidence or indication that these debtors were under any overt coercion or duress in respect to their referral to Mr. Devers, it is clear from the circumstances of these cases that a referral to this attorney would almost inevitably result. (See Transcript, p. 23, 48 and 74.) His separate office marked "Attorney at Law" was located in the same office suite as AFS and the first contact or meeting with this attorney, qua attorney, came shortly after their initial visit to AFS—often on the first day. The type of debtor involved, as evidenced not only by testimony given by the debtors summoned in connection with the court's show cause order, but also from a review of the statements of affairs filed in the remaining cases, was the type of individual who, because of his financial plight, was not likely to seek independent counsel. Then, too, from the evidence of record, it is clear that the 'creation' of AFS in October 1979, and the respondent's entry into the private practice of law at the same time, was obviously orchestrated to generate debtor cases through the medium of AFS—no other plausible conclusion can be drawn from these facts. Accordingly, as proscribed by DR 2–103, in-person solicitation is prohibited if:

> "(3) the potential client is apparently in a physical or *mental condition* which would make it *unlikely* that he or she could exercise reasonable, con-

recommendation of third parties—relatives, friends, acquaintances, business associates, or other lawyers—and *restrained* publicity may be helpful. *A lawyer should not seek to influence another to recommend his or her employment.* A lawyer should not compensate another person for recommending him or her, for influencing a prospective client to employ him or her, or to encourage future *recommendations.* Advertisements in public communications, whether in law lists, announcement cards, newspapers, or on radio or television, should be formulated to convey only information that is necessary to make an appropriate selection. Self-laudation should be avoided. Information that may be *helpful in some situations would include:*

sidered judgment as to the selection of a lawyer." (Emphasis added.)

In *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), the Supreme Court decried the evils resulting from in-person solicitation in these words:

"Unlike a public advertisement, which simply provides information and leaves the recipient free to act upon it or not, in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking; there is no opportunity for intervention or counter-education by agencies of the Bar, supervisory authorities, or persons close to the solicited individual. The admonition that "fitting remedy for evil counsels is good ones" is of little value when the circumstances provide no opportunity for any remedy at all. In-person solicitation is as likely as not to discourage persons needing counsel from engaging in a critical comparison of the "availability, nature, and prices" of legal services, cf. *Bates*, 433 U.S., at 364, [97 S.Ct. 2699.] . .; it actually may disserve the individual and societal interest, identified in *Bates*, in facilitating "informed and reliable decisionmaking." *Ibid.* 436 U.S. at 457, 458, 98 S.Ct. at 1919.

1. Office information, such as name, including name of law firm and names of professional associates, addresses, telephone numbers, credit card acceptability, languages spoken and written, and office hours;
2. Biographical information; free description of the practice including the statement the practice is limited to one or more fields of law; and (4) permitted fee information. (Emphasis added.)
While there is no indication or evidence of record that the attorney paid any compensation to AFS, certainly he failed to heed the ethical considerations in creating an agency that would inevitably result in numerous debtor referrals.

In this case, the advertisement or solicitation—unlike the unadorned ad in *Bates v. State Bar of Arizona*[24]—was bound to be misleading—particularly for the kind of debtor who in fact responded to it. While the advertisement was that of AFS and not that of the respondent, as a practicing attorney, the respondent was clearly cognizant of the ad and responsible for it. In fact, he was one of the ultimate beneficiaries as well. This is not the situation where the individual attorney was interested in making available his services through a bar referral or other legal assistance program; rather, a debt consolidation agency, operating contrary to the mandates of existing law,[25] was controlled and directed by the attorney and the inevitable outcome had to be these instant referrals. This is a classic example of an attorney doing indirectly that which he would be prohibited from doing directly. Accordingly, the court concludes that the attorney has acted unethically in permitting and sanctioning an ad to be run which by its nature was under the circumstances treacherously deceptive and by further causing a situation which would deter the individual debtor from making "informed and reliable decisionmaking."[26] *See Bates, supra.*

**2) DR 3–101 Aiding Unauthorized Practice of Law.**[27]

It is clear to the court, based on the evidence of record (including the respondent's own testimony) that the business affairs and activities of AFS were those of a "debt adjusting" corporation within the meaning of Title 22, § 3426 of the D.C. Code.[28] However, the business is captioned, "financial planning" or "financial services," its true identity is characterized by its activities and functions. In this case, AFS, for a fee, would contact debtors' creditors and arrange a pro-ration based on the financial circumstances of the individual. Their functions were appropriately characterized in the legislative history underlying the enactment of this legislation in these words:

"... a debt adjuster lends no money; he only takes it. In the process, he may mislead the harried debtor into believing that his creditors will all be repaid at once." S.Rep. 288, 91st Cong., 1st Sess. (1969), at 2 (report by the Committee on the District of Columbia).

This is vividly demonstrated by the advertisement employed by AFS which opti-

---

**24.** In *Bates v. The State Bar of Arizona*, the ad merely inquired: "Do you need a lawyer?" See Appendix to Supreme Court's opinion in 433 U.S. at 385, 97 S.Ct. at 2710. While the Supreme Court in *Bates* permitted advertising by attorneys because of First Amendment and Fourteenth Amendment Rights, it expressly warned that:

"Similar objections might justify restraints on in-person solicitation. We do not foreclose the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required of even an advertisement of the kind ruled upon today so as to assure that the consumer is not misled . . ." *Bates*, 433 U.S. 350, 384, 97 S.Ct. 2691, 2709, 53 L.Ed.2d 810 (1977).

**25.** See part 2, *infra*, of this court's Conclusions of Law relating to the unauthorized practice of law.

**26.** The Bankruptcy Code, itself, is not intended as a panacea for all debt-ridden individuals and certainly, the 'catchy' caption ¡of "Get out of debt," obviously omits the multi-faceted problems that are unique to each individual case. Clearly, insofar as AFS was acting as a debt-consolidation agency, and contrary to existing law, the attorney was causing debtors to be referred to an agency which, under the circumstances, would be acting contrary to their individual interests.

**27.** The original American Bar Association Canon 47, the predecessor of the Code's Rule DR 3–101 and the ABA Canon 47 (adopted in 1937) recites:

"No lawyer shall permit his professional services, or his name to be used in aid of, or to make possible, the unauthorized practice of law by any lay agency, personal or corporate.

**28.** Title 22, Section 3426(a)(1) of the D.C.Code specifically defines "Debt-adjusting." See Footnote 2, *infra*. Title 22, Section 3426(c) provides that the statute shall not apply to "debt adjusting incurred incidentally in the lawful practice of law." However, this exception is not applicable here inasmuch as the corporation was a for-profit corporation comprised primarily of non-lawyers and was not a professional corporation. The involvement of the respondent was that of an employee and as house counsel to the corporation itself.

mistically states: "Get out of debt." It is further clear that the activities of a debt-adjusting business constitute the unauthorized practice of law in this and many jurisdictions, including the neighboring jurisdictions of Maryland and Virginia. *Cf.*: Va. Code (1958), § 54–44.1. The raison d'etre of such legislation is further found in the Senate Report, *supra*, which explains that:

> "The committee believes that debtors finding themselves in situations approaching insolvency often need legal assistance to marshal assets and to advise them on the legality of various claims, legal remedies governing the debtor-creditor relationship or the applicability of the Bankruptcy Act."

The evils which arise from such activities are obvious because it is usually the untutored and ignorant that fall prey to the activities of such businesses. In upholding the constitutionality of such statutes, the Supreme Court in *Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963) held:

> "The business of debt adjusting gives rise to a relationship of trust in which the debt adjuster will, in a situation of insolvency, be marshalling assets in the manner of a proceeding in bankruptcy. The debt adjuster's client may need advice as to the legality of the various claims against him, remedies existing under state laws governing debtor-creditor relationship, or provisions of the Bankruptcy Act—advice which a non-lawyer cannot lawfully give him." *Ferguson* at 732, 83 S.Ct. at 1032.

*See also: American Budget Corporation v. Furman*, 67 N.J.Super. 134, 170 A.2d 63, aff'd., 36 N.J. 129, 175 A.2d 622 (1961) (upholding the validity of a New Jersey statute prohibiting activities by debt consolidation agencies).

In this case, the respondent, as attorney for the debtors, did not passively receive referrals from AFS without being aware of their underlying activities. Rather, by his own testimony, he assisted in the development and management of the corporation known as AFS and not only was paid by them on a weekly salary basis, but agreed to a 10% profit-sharing arrangement with the corporation.[29] Moreover, in addition to acting as general counsel for AFS, the respondent also was an officer (vice president) and a director through February 1980, at which time he resigned these latter positions.

■ Accordingly, the court concludes that the respondent has clearly violated DR 3–101 in respect to his active involvement with AFS, and the latter's engagement in the unauthorized practice of law.

3) DR 5–105 Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer

The court is of the opinion that this Canon was violated by the respondent by reason of the close relationship existing between AFS and its attorney, the respondent, and the corresponding relationship existing between the respondent and each individual debtor, his clients. The respondent was admittedly counsel to AFS at the same time that he was representing each individual debtor in the above-captioned cases. AFS assessed a fee for their services, which, as pointed out above in part 2, *infra*, was contrary to law and public policy. In short, there was no valid consideration for their "debt adjusting" services. Yet, the attorney continued to represent these individuals in connection with the filing of the various Chapter 7 and Chapter 13 cases under the

---

**29.** It is only fair to note the respondent's version of how this occurred. At the show cause hearing he testified:

"A In January they were reincorporated as a non-profit corporation.
Q They went through a—why was the reason for that?
A Because it was brought to their attention that a provision of the D.C.Code prohibit profit-making corporations from engaged in the business in which they were engaged. It was unknown to them and to me at the time although diligent searches had been made of the D.C.Code for that purpose." (Transcript, p. 125.)

How this occurred is hard to believe in view of the fact that the District of Columbia Code Index contains the following headnote:

"Debts
Debt Adjusting—22–3426"

new Bankruptcy Code until the entry of the show cause order—at which time, apparently on the sage advice of respondent's counsel, he voluntarily withdrew from further representation. If counsel were properly and ethically to represent the interests of these debtors, it would be difficult to envision how he could advise such debtors of a potential cause of action against AFS—the respondent's principal corporate client [30] —without violating his corporate client's rights. Then, too, what would counsel do if there were unpaid charges due to AFS for their alleged "services" when an individual debtor decided to filed a voluntary petition in bankruptcy? Admittedly, based on Mr. Devers' testimony and a review of the various Statement of Affairs filed in each of the cases, there was never a debt owing to AFS at the time of filing a petition in bankruptcy. Nonetheless, there is a basis for a potential conflict and the rules specifically state that proferred employment should be declined ". . . if it would be *likely* to involve [the attorney] in representing differing interests, . . ." [emphasis added]. In this case, the very nature of the relationship between the parties gives rise to a potentially serious conflict of interest.

■ Accordingly, the court concludes that the respondent has violated DR 5–105.

4) DR 6–101. Failing to Act Competently.

The unmistakable inference to be drawn from the incorporation of AFS in October of 1979 and Mr. Devers' entry into the private practice of law, is that the new Bankruptcy Code would give rise to a readily available market of eligible debtors for their eager, but misguided services. The

respondent himself admitted that he had never filed a petition in bankruptcy prior to October 1979, and had not even bothered to attend a seminar or conference on the new Code. Despite his disingenuous testimony as to why he did not attend such seminars [31], he nonetheless did not hesitate to advise and represent clients in this area of the law.

■ As noted in this court's Findings of Fact (see also Transcript, p. 2–5) the respondent's failure to properly represent his clients resulted in the dismissal of some cases, a transfer of others to adjacent jurisdictions because of improper venue, and, in many Chapter 13 cases, a failure to secure confirmation, or, at least, a delay in confirmation. This court's own personal observations of this attorney clearly confirm that inadequate counseling and a lack of knowledge of the new Code resulted in these numerous deficiencies and failures.[32] Members of the public are entitled to informed and competent counsel, and if attorneys fail to conscientiously respond to these demands, the entire system of justice invariably suffers.

This court, as is true of all courts, does not expect or demand perfection in debtor representation, but it does expect that all attorneys who practice before it will take the time to study and examine all available legal sources so that the representation of debtors will be in conformity with the minimum dictates of the law.

In Levy and Sprague, *Accounting and Law: Is Dual Practice in the Public Interest?*, 52 A.B.A.J. 1110, 1112 (1966), the authors wisely observed:

"We have undergone enormous changes in the last 50 years within the lives of

---

**30.** There is no evidence that any of the individual debtors who testified at the show cause hearing actually paid any funds to AFS for debt-adjusting services, but there are at least 29 other cases where this might be a distinct and potential cause of action.

**31.** Ironically enough, in this regard, the respondent testified that he tried to ". . . read as many articles as much information—acquire as much information as possible on the new Act so I would feel capable of assisting them." (Transcript, p. 117.) He further testified that he ". . . was not aware of any seminar

. . ." (Transcript, p. 137.) The court finds this testimony to be extremely self-serving under the circumstances, and, in fact, finds it incredible, in view of the fact that every large urban area in the country, including the District of Columbia, conducted numerous seminars on this new legislation during the year preceding its effective date. In fact, this court participated in no less than five such seminars between February of 1979 and as late as September 30, 1979.

**32.** See Footnote 14, *infra*; Findings of Fact, *infra*, text following Footnote 15.

most of the adults living today who may be seeking advice. Most of these changes have been accompanied by changes in developments in the law. . . . Every practicing lawyer encounters these problems and is often perplexed with his own inability to keep up, not only with changes in the law, but also with changes in the lives of his clients and their legal problems.

"To be sure, no client has a right to expect that his lawyer will have all the answers at the end of his tongue or even in the back of his head at all times. But the client does have the right to expect that the lawyer will have devoted his time and energies to maintaining and improving his competence to know where to look for the answers, to know how to deal with the problems, and to know how to advise to the best of legal talents and abilities."

In this case, the respondent was obviously more concerned with the commercial aspects of a business,[33] than with the demands of the individual debtors, his clients.

█ For these reasons, the court finds that the attorney has violated the provisions of DR 6–101.

5) DR 1–102. Misconduct.

As the result of the aforegoing conduct, the respondent has engaged in a persistent course of conduct which cannot help but lower public esteem for the bar. The enactment of the Bankruptcy Code on November 6, 1978,[34] was never intended to be a "device" or "gimmick" for attorneys to increase their income at the expense of the general public and the mass production approach to the practice of law in this area will inevitably decrease the quality and value of services to those who need it most.[35]

In fairness of the respondent, the court must note that, although the course of conduct engaged in was obviously inimical to the administration of justice, there is no evidence, nor does the court believe, that this attorney engaged in any intentional fraudulent conduct. Rather, the tragic scenario of events recounted in this opinion, came about as the result of ignorance, inattention, and negligence—not a knowing, wilful course of fraud on the part of counsel. Unfortunately, the end result has obviously not been a happy one for either the respondent, his clients, or this court.

Nonetheless, the failure of counsel to conform with the Canon of Ethics cannot be sanctioned, and this court, therefore, has concluded that the overall pattern of conduct engaged in by the respondent constitutes a violation also of DR 1–102.

## CONCLUSION

█ The conduct of this trial hearing and the attendant responsibility of deciding this matter has not been a pleasant one for this court. It is indeed unfortunate that the conduct engaged in by counsel has caused so much of a drain of judicial time and resources, as well as the time and energies of Bar Counsel—yet, the responsibility of the court is clear, and, based on the evidence of record, the court concludes that this attorney has violated the disciplinary rules set forth in the Code of Responsibility and the value of his services in each of the above-captioned cases is "zero". Wherefore, this court will enter an appropriate order which will direct the refund of fees in each of the above-captioned cases to the real party in interest, or a cancellation of fees in the event that no fees were paid; will further direct an accounting on the part of respondent as to all fees received (exclusive of filing fees) in all of the above-captioned cases; pursuant to the Local Rules of the United States Bankruptcy Court, and based on a pending investigation

---

**33.** As noted in the Findings of Fact, the respondent, during the critical period of time between October 1979 and January 1980, devoted approximately 70% of his time to the affairs of AFS. See Findings of Fact, *infra*, text accompanying Footnote 11.

**34.** The effective date for the substantive provisions of the new law was, of course, October 1,

1979. *See:* Title IV of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, § 402(a).

**35.** This is not intended, in any way to deprecate the valuable and needed services of many legal clinics who conscientiously attempt to render legal advice and services to those unable to afford it.

by Bar Counsel, the court will direct that such Bar Counsel take appropriate steps to discipline the attorney in question, in accordance with the established provisions of the United States District Court Rules incorporated by reference; will further direct that respondent be responsible for the cost of the transcript in the amount of $334.50, and that such costs be paid within 10 days of the date of this order; and will further request that the corporation counsel for the District of Columbia conduct a thorough investigation as to the affairs of AFS with a view to criminal prosecution, if, in their view, the evidence warrants same,[36] and will further direct the United States Trustee to ascertain what, if any, cause of action may lie against AFS for their activities and conduct in each of these cases.

---

**36.** Although the corporate status has apparently been changed to that of a not-for-profit corporation, the testimony of respondent indicates that the conduct of business has not changed in substance. In fact, charges are still being assessed and, although these monies will apparently be utilized for certain non-profit purposes, the entire staff of AFS is still comprised of three individuals whose training in this area is dubious. As evidenced by the testimony of the respondent himself, he was not even aware of the occupational or training background of the individuals involved in this business. The operation of a debt consolidation agency by a corporation of this nature is a far cry from the conduct of such reputable non-profit counselling services as the Consumer Credit Counselling Service of Greater Baltimore, Inc., which is funded by banks, credit unions and similar organizations. *See*: S.Rep. 288, 91st Cong., 1st Sess. (1969), *supra*.